Case number 24-1533 from the Western District of Missouri, United States v. Camron Henry. Ms. Wilson, glad to see you made it. I apologize, Your Honor, I ran into some issues with the ice. May it please the Court, Chelsea Wilson on behalf of Camron Henry. We're asking the Court to hold that the minimal record here does not warrant the guidelines enhancement under 3C1.2 for recklessly creating a substantial risk of death or serious bodily injury during flight. And the bottom line in our view is that the evidence was Mr. Henry did nothing more than flee from law enforcement with a firearm in his pocket. And this case is different from many of the other cases you'll see cited in the briefing for a couple of reasons. One reason is there are no intervening acts to examine in terms of recklessness or creation of substantial risk. Mr. Henry doesn't ignore commands from law enforcement officers to stop. He doesn't reach for or draw his weapon. He doesn't toss his weapon. He doesn't struggle with police officers when they get to him. So there's no other actus reus, if you will, to look at in terms of looking at recklessness or creation of risk like there is in many of the other cases. Except for the hands, right? Yes, and the government talks a lot about him keeping his hands under him. And I want to point out that in their sentencing memo at sentencing, the government alleged Mr. Henry had reached for that one of the officers felt Mr. Henry was reaching for a weapon. And Mr. Henry contested that. He said he never reached for a weapon. The government offered no proof he was reaching for a weapon. They only said that he kept his hands underneath him. And that is for a brief couple of seconds that it takes an officer to cover the ground that a taser can reach. So I don't believe that that is sufficient. There's no movement toward the firearm. Was the weapon located near his hands? The weapon is in his front jacket pocket, and they say his hands are underneath him. The government didn't play the video, so we don't know where underneath him his hands are in relation to that firearm. Was the gun loaded and around chambered? Yes, Your Honor. The gun was loaded. There was a round in the chamber. We don't know the position of the hammer or the safety or any of those facts. We don't even know the specific kind of gun it is, do we? We know that it was a Taurus 9mm, G3, I believe. But we don't know anything beyond that about the firing mechanisms or safety. And full disclosure, I opened Google, and there are all different kinds of guns that are called that. Yes. Yes. All different looking kinds of guns. Correct. So we didn't have any sort of information about the conditions under which a gun like that might accidentally fire, which is the government's first theory for why this was reckless creation of substantial risk. And that theory wasn't really pushed below, and as a result, I think it boils down to a failure of proof on appeal. There was no proof about the risk presented by running with a gun in one's pocket, and so they're asking this court to essentially take judicial notice that this risk is so prevalent that it qualifies as substantial. And that is not a matter that's subject to… What's our standard of review? It's a clear error standard of review. The district court did not make a finding about, because this was not a theory that was really pressed below, the district court's finding was pretty minimal. He basically just said, I believe when you run with a gun in your pocket, particularly my memory is there was a crowd around when he first took off, the enhancement's going to apply. And that is the only finding that he makes, right? I mean, there's nothing else anywhere that's written, no supplement. It is just simply, well, it's two sentences in the course of disposing of the objection and then moving to sentencing. Correct, Your Honor. There is one other point in the sentencing transcript that I think maybe could shed some light on his thinking, which is on page four of the sentencing transcript when they're first starting to talk about this. Defense counsel, when asked if there are objections, says the defense objects to this particular enhancement. And the court says that's whether or not he basically placed law enforcement officers at risk when he ran. And she says, yes, Your Honor. So that could perhaps shed some light on whether, on who he thought the risk was to, but we don't have any indication of whether the district court thought the risk was from accidental discharge or from the government's other theory, which is the idea that either Mr. Henry or the officers were about to use these firearms. I don't think the accidental discharge theory is proven below, and I don't think this court is in the position to make that finding. I don't think that is appropriate. The government points to Zamora and says, you know, putting a firearm in one's waistband recklessly creates a substantial risk of death or serious bodily injury. But that is not the holding in Zamora. The holding in Zamora was that the district court finding that on the record it had before it was not clear error. And the district court here did not have any sort of record like that before it and didn't make any explicit finding like that. And I don't think it's appropriate for this court, with respect, to put itself in that place without that record. The government's other theory... You know, I get where you're coming, but there is an extremely minute risk of discharge for every firearm, even one with the safety on, just because if you get the right drop, you could get percussion against the cap for a chambered round, right? But it ranges from, you know, an $18 Saturday night special that you bought used and manufactured in 1975, and you drop that baby, there's a high probability, to guns that, you know, you could drop it 10,000 times from, you know, the fourth floor, and it will go off once, right? I mean, that's what we know. And your argument is essentially that that is not enough for the court to take judicial notice that there's an inherent risk. That there is a substantial risk. So in the guideline, we know that substantial doesn't refer to the gravity of the risk, because that's covered by death or serious bodily injury. So the word substantial has to do some other work in the guideline, and I think that refers to the level of the risk, the likelihood of the risk. And that's also the government's burden, is showing that this isn't just a theoretical possibility, it's not just an inherent, you know, minuscule risk, but that it rises to the level of substantial, and they didn't prove that here. There's just not the evidence in the record from which the district court could have drawn that conclusion, and there's not evidence in the record from which this court can affirm on any basis supported by the record. I have just a couple of minutes left, but the other argument is this sort of escalation theory, volatile situation. I think that theory is just not supported by the case law. The cases that the government cites aren't on point with the facts here. They both involve someone reaching for a firearm. I have not found any cases where the courts have imposed this enhancement based on that type of theory, the theory that someone was potentially about to use a firearm, where no one is actually reaching for a firearm. It just becomes too speculative a risk. There are too many steps removed. The Gould case out of the Fifth Circuit has this similar issue. I think Mewkes speaks about this issue as well, out of the Sixth Circuit. I think we're too far away here for that to be the case where we have no evidence Mr. Henry was drawing or reaching for his weapon. We have no evidence that any of these officers were drawing or reaching for their weapons. I don't think you can show that either the officers or any of these purported bystanders were at risk. Finally, we've talked about this bystander issue in our briefing and our belief that that finding was clear error. I don't believe this court actually has to resolve that issue to find in our favor. I think regardless of whether there are bystanders or not, the government's proof on either of these theories fails. If there are no other questions, I'll reserve the remainder. Thank you. Thank you. May it please the Court. David Wagner for the United States. When thinking about this issue, this reckless endangerment during flight issue, I think it's helpful to consider what this court has said is the standard of care in this sort of a situation. This comes from the Davidson case, which is cited in the briefs, and I think it's also restated in the Esquivel case, which is also cited. This court has said that the standard of care in a situation where an individual confronts law enforcement is peaceful surrender. That's what the law expects of somebody when confronted with officers, and I think that's important because that's the baseline at which we approach this issue of whether somebody's flight created reckless endangerment. Obviously, Mr. Henry is arguing that all he did in this case was armed flight, but I think a careful examination of the facts shows that there's substantially more. In fact, I think there's three things more than mere armed flight going on in this case. First, there's the condition of the gun. Second, there's the positioning of the gun. And third, there's his suspicious behavior prior to flight. Regarding the condition of the gun, we know that this gun was loaded and it had a chambered round, and we know that it was tested and found to be functional. The only reference, I think, is in the PSR of what kind of gun it is, right? That's correct, Judge. Okay. It's very vague, isn't it? Because it just says a general manufacturer of the gun, not a particular model. Well, I think it says the model. It's a Taurus G3, model G3. Okay. Do you know how many G3s, different looking G3s there are? I think I did the same Google search. Okay, good. Okay, then you and I are unqualified to talk about it, which is good, you know, judicial notice. But let me proceed for a second. Some of those have safeties and some of them don't, right? I think the majority I saw do have safeties. Yes, but just looking down that Google page, some didn't even have a safety, right? I believe I saw one without a safety. And some had different kinds of safeties. So it's the government's burden here, right? It is our burden by preponderance, yes. Okay. Did you have the responsibility to show what kind of gun this was? Because it makes a big difference. Well, it makes some difference. You know, whether it even has a safety. Perhaps. I think our position would be safety or not. A loaded functional gun with a chambered round still presents a risk of discharge. And I think, you know, just from a common sense perspective, my understanding is the first rule of firearm safety is you always point a gun in a safe direction. That's because regardless of whether you think it's loaded, regardless of whether you think it's got a round in it, there's a risk to pointing a gun at things you don't intend to shoot. And that risk was – I'm sorry, Judge Erickson, did you have a question? No, you can finish. Okay. I think that risk was presented in this case particularly by the positioning of the gun. Because it was unsecured in Mr. Henry's pocket. It was not safely stored in a holster. He was running from the police. The gun was bouncing around in his pocket. And then after he fell, he kept his hands underneath him. That's what the PSR says. The gun, of course, was found in his right jacket pocket. And beyond that, one of the officers was responsible to pull the gun out of the pocket. And when he did so, the muzzle was pointed in the air. That's a danger to the officers around. And I would submit that that's a danger regardless of whether the gun has a safety. In the air, you meant away from his body? I mean, in the air as he fell down. And I think in the air means as he was lying there and the officers were pulling it out of his pocket. So it's away from his body? Away from Mr. Henry's body. I'm not sure. Because I think it was underneath him. So it may have been pointed towards his body. Okay, thank you. I will acknowledge the PSR doesn't go into that level of detail. So there's some inference in that response. The guideline itself talks about substantially, recklessly creating a substantial risk of death or serious bodily injury. And the argument's been advanced that there's no evidence that this gun posed any substantial risk, that there is a mere theoretical risk and that the burden rested on the government to come through, come forward with evidence establishing the risk. What's your response to that? I think our position is that, first of all, a gun that's loaded, functional, with a chambered round presents a substantial risk. Regardless of what the position of the safety is, what the position of the hammer is, we think that that is a substantial risk. And I think, as I understand this Court's cases, that's how I read them. And we've got, I think the two most sort of on-point cases I would point you to would be the Davidson case and the Esquibel case. And there we've got this Court talking about the risk of firearms discharging without even noting whether the guns were loaded. Mr. Henry's pointed out that the briefing shows that the guns were loaded, but I think it's important that this Court didn't find it necessary to go into that level of detail. The point is that a gun that's dropped or, in this case, recklessly stored in a pocket presents a risk. And in Davidson, there was resisting and fighting involved? There was climbing a fence, I believe. Yeah, it went over the fence, and then when the police got caught to him, there was still resisting and fighting going on. Correct. Does that make a difference in your view? I think the risk is the same, whether the defendant is fighting or keeping his hands under his body, as we have here. And the other thing, along those same lines, Judge, and this responds to a question that Judge Grunder asked about the standard of review. I think Mr. Henry's correct that the standard of review here is clear error. Whether the defendant's actions were reckless and whether they presented a substantial risk of harm, those are factual questions that the District Court is equipped to make and that this Court should review for clear error. So we're not asking this Court to draw any bright lines in this case. We're not asking for a bright, we're particularly not asking for a bright line rule that any armed flight satisfies the guidelines. All we're asking this Court to do is find that the District Court's factual findings were not clearly erroneous. Is there any evidence that the officers thought he was reaching for the gun? Not in the PSR. And that's the only source of evidence in this case? Correct. Unobjected to PSR, right? Correct. Yeah, the evidence is that when he encountered the officers prior to flight, he turned his body from them, which caused them to suspect he was carrying a gun. And then after he was hit with the taser and fell, he kept his hands under his body. That's the evidence in the PSR. I'd like to address what the District Court found about the crowd. There's some suggestion in the briefing that that is clearly erroneous because the PSR doesn't say there was a crowd at the point he fled. That's true as far as it goes, but I think it's worth noting that the government had the video at the sentencing hearing, and when the District Court said there was a crowd, there was no objection to that finding by the District Court by Mr. Henry. I suspect because they knew that had the video been played, it would show that there was people around. I don't want to overstate the video. I mean, I have obviously viewed it. It's not in the record. I don't know that I would say there was a crowd still around, there were people still around. I think the point that matters for the appeal and the record before this court is that the video was available and could have been played if there had been any objection made to the District Court's factual finding about there being a crowd. The other thing is there's been some discussion about judicial notice and whether it's appropriate to judicially notice the risk of a gun of this particular model in this particular condition. I don't think we're really asking the court to take judicial notice of this fact so much as just to take a common sense approach. That's how I read this court's decisions in Davison and Esquibel, a common sense approach that a loaded gun that works presents a risk of inadvertent discharge to people in the vicinity, particularly when it's stored in a pocket while someone is running from the police. How do we deal with, and I just looked this up because my recollection was that the question was placed to the judge, or a statement was made to the judge, in case you have any questions, I am prepared to play the body camera footage if it needs that, but otherwise I can also rest on what's written in my written memorandum. The court says I've looked at it, and he previously mentioned that he'd read all the briefs. And so the question is, can we draw an inference from that, that he actually looked at the video, and does that make any difference? I wouldn't ask the court to draw that inference. I'm not aware that the video was provided to the district court. Okay, so it was never provided to him, okay. Not to my knowledge. I do read that statement as referring to the briefs. The briefs, which is just the second time that you said that, I've read your briefs. Exactly. However, I think, you know, we obviously believe the record is sufficient to affirm in this case, but if this court were to disagree, I know that oftentimes the government doesn't get a second bite at the apple, but here we did have the video. We were prepared to play it. I think there's reason to allow further record development if this case were remanded. Of course, we're asking this court to affirm. I see no further questions. Thank you. Thank you, Mr. Wagner. Just a few quick points. First, the Davidson case was not a case that was about this court applying judicial common sense. In the district court in Davidson, there was testimony offered about the risk of throwing firearms and particularly throwing low-cost firearms like the one in that case and the risk that that presented of accidental discharge. So Davidson was not a case where this court applied its own factual findings about those risks and created a rule, like the government is asking that it do here. If the government wants to extend Davidson in that manner to carrying a firearm in one's pocket, it needs to take a test case, put on evidence in the district court, ask a district court to make those findings, and then this court can review those findings for clear error. Secondly, the issue of Mr. Henry's hands being beneath him. In the Muchs case, you had the officers telling Mr. Muchs to drop the gun, and on appeal, the government argued that it didn't matter whether Mr. Muchs dropped the gun in response to the officers telling him to or while he was running after that, that either way he created a risk of drop fire. And the Sixth Circuit said, you can't do that. You can't create that sort of Morton's Fork. And I think we have a similar situation here where they're saying, well, he kept his hands beneath him for those couple of seconds. If he had moved his hands, what do we think would have happened? One, they would argue that the enhancement applies because he's reaching. And two, he might have gotten shot. I don't think you can force a defendant to make a choice between more prison time for getting this enhancement and being shot for moving his hands when he has officers coming up to disarm him. And then the last thing that I wanted to address was the record on remand. This case squares up really nicely with the Ricky Lee Johnson case that we cited. There, the government didn't have witnesses, and they said, Your Honor, we can put on the probation officer to read from the police report, or we can continue this. And the district court said, We can go forward. I don't think this rule of evidence applies here. And they said, I think you're right. I don't think it applies. And they went forward. And I think we have a similar situation here. And when this court disagreed about the rule on remand, they said, You don't get a second bite of that apple. And I think if you want to come in and take the district court's temperature about whether you're going to win, you can do that, but you're going to bear the burden of the consequences if you're wrong. So we would ask the court to reverse in remand without reopening the record. Thank you. Thank you, counsel. The court appreciates both counsel's appearance and argument. The case is submitted, and we'll issue an opinion in due course. You may be excused.